**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| RAMONA WATERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 5:09-CV-238 (MTT) |
| | ) |
| BALDWIN COUNTY, GEORGIA, | ) |
| | ) |
| Defendant. | ) |

## ORDER

This matter is before the Court on the Defendant's Motion for Summary Judgment (Doc. 24) (the "Motion"). For the following reasons, the Motion is denied.

### I. INTRODUCTION AND SUMMARY JUDGMENT STANDARD

In this case, the Plaintiff is suing her employer, Baldwin County, Georgia, for alleged violations of the Equal Pay Act of 1963, 29 U.S.C. § 206 (the "EPA") and Title VII of the Civil Rights Act of 1991.[1] According to her Amended Complaint, the Plaintiff is being paid less than men who perform the same job as the Plaintiff. The Defendant concedes that the Plaintiff can make out a prima facie case under the EPA and Title VII, but alleges that its reasons for the pay disparity, i.e., the emergency conditions at the Baldwin County Tax Assessors' Office, the levels of experience of the male comparators as compared to the Plaintiff's level of experience, and the Plaintiff's failure to negotiate her salary, are sufficient to avoid either EPA or Title VII liability. The Plaintiff argues that the Defendant's reasons are instead pretext.

---

[1] In her Amended Complaint (Doc. 14) the Plaintiff asserts claims for gender discrimination, for race and national origin discrimination, and for retaliation. The Plaintiff has since dismissed all claims except for those based on gender discrimination. (*See* Doc. 30).

The applicable law is well settled and not in dispute. However, the facts, and the interpretation of those facts according to the law, are far from settled. As a result, the Court is unable to grant summary judgment to the Defendant. Summary judgment is appropriate when, having resolved "all reasonable doubts about facts . . . in favor of the non-moving party," the Court finds there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995). Here, as will be shown below, there is so much uncertainty regarding the facts that the issues in this case simply must be put to a jury.

Before addressing the facts, though, it is helpful to note the legal framework governing EPA and Title VII claims.

## II. APPLICABLE LAW

### A. The Equal Pay Act

An EPA Plaintiff[2] establishes a prima facie case if she shows that her employer "pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions….'" *Corning Glass Works v. Brennan*, 417 US 188, 195 (1974). However,

> [o]nce a prima facie case is demonstrated, to avoid liability the employer must prove by a preponderance of the evidence . . . that the differential is justified by one of four exceptions set forth in the EPA. . . . Those exceptions are: "(i) a seniority system; (ii) a merit system; (iii) a system

---

[2] In her Response, the Plaintiff claims that she is also pursuing a claim under the Fourteenth Amendment. Aside from a general allusion to "constitutional rights" in her Amended Complaint, though, there is no mention of a separate Fourteenth Amendment claim. However, because the EPA was passed as a "permissive exercise of Congress's power under § 5 of the Fourteenth Amendment," the Court will assume that when the Plaintiff speaks of a Fourteenth Amendment claim she is speaking of her EPA claim. *Belch v. Bd. of Regents of the Univ. Sys. of Georgia*, 27 F.Supp.2d 1341, 1348-50 (M.D. Ga. 1998).

> which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."

*Irby*, 44 F.3d at 954 (internal citations omitted). The employer's burden on its defense "is a 'heavy one[]' . . . because the 'defendants must show that the factor of sex provided *no basis* for the wage differential.' . . . If the defendant fails to meet this burden, the court must enter judgment for the plaintiff." *Id.* (emphasis in original) (internal citations omitted). If the employer is able to carry this heavy burden, then "the plaintiff must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential. . . . If plaintiff is able to create the inference of pretext, there is an issue which should be reserved for trial." *Id.* (internal citations omitted).

Here, the Defendant has conceded that the Plaintiff can prove her prima facie case. In response, the Defendant asserts as its defense that the pay differential is justified by the greater experience of Riley, the Plaintiff's male comparator, relative to the Plaintiff, which falls under the "any other factor other than sex" exception. *See id.* at 955.

**B.  Title VII of the Civil Rights Act of 1991**

A Title VII Plaintiff[3] may choose to attempt to prove her case with no direct evidence of discrimination, as the Plaintiff has done here. A victim of alleged job discrimination may rely on circumstantial evidence and the framework for analyzing circumstantial evidence first applied in *McDonnell Douglas Corp. v. Green*, 411 U.S.

---

[3] In addition to her EPA, Fourteenth Amendment and Title VII claims, the Plaintiff has asserted a § 1983 claim. However, a § 1983 claim for discrimination is proved and defended in the same manner and with the same steps as a Title VII claim. *See, e.g., Arrington v. Cobb County*, 139 F.3d 865, 872-73 (11th Cir. 1998). Therefore, proof of, or failure to prove, a Title VII claim is proof of, or failure to prove, a § 1983 claim.

792 (1973), to make her case. If a plaintiff establishes a prima facie case of discrimination, which the Defendant concedes that the Plaintiff has done here, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). The burden then returns to the plaintiff to prove that the employer's reasons are pretext. *Id.* at 253. The employee can meet this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence." [4] *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (emphasis added). If the proffered reason is one that might have motivated a reasonable employer, the employee "must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman,* 229 F.3d at 1030. If a defendant articulates more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive summary judgment. *Id.* at 1037.

---

[4] The use of the disjunctive is significant and it underscores a potentially confusing aspect of the *McDonnell Douglas* test. When stated in the conjunctive, i.e., that the employee must prove that the proffered explanation is false *and* the true reason is discrimination, it harkens back to the so-called "pretext-plus" approach to discrimination analysis. As noted by Judge Wilson in his concurring opinion in *Conroy v. Abraham Chevrolet-Tampa, Inc.,* 375 F.3d 1228, 1236 (11th Cir. 2004), the Supreme Court in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993) "flatly rejected the so-called 'pretext-plus' approach to discrimination analysis, which had required the plaintiff not only to demonstrate that the employer's asserted reasons were pretextual, but also to introduce additional evidence of discrimination." Yet it was in *St. Mary's* that the Supreme Court, notwithstanding its holding, also said that an employer's reason "cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." 509 U.S. at 515. Even subsequent to *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), which supposedly disposed of any lingering viability of pretext-plus analysis, courts continue to cite *St. Mary's* for the proposition that the employee must prove the employer's reason is false *and* that discrimination was the true reason for the employer's action. *See Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007); *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006).

Here, again, the Defendant has argued that the pay differential was justified. The Defendant cites as legitimate, nondiscriminatory reasons the "desperate" situation at the Baldwin County Tax Assessors' Office, the greater experience of Riley, and the fact that Riley negotiated his salary.

**C.     A Note on the EPA and Title VII**

The main difference between an EPA claim and a Title VII claim is the burden on the employer when proving its defense. Under the EPA, the employer's burden is significant—the employer must show that gender provided no basis for the wage differential—whereas under Title VII the employer's burden is initially very light—all the employer has to do is articulate a legitimate, nondiscriminatory reason. Thus, an employer's proffered reason under the EPA might not be sufficient to overcome the Plaintiff's prima facie case, whereas it would be under Title VII. Likely, however, the result will be the same under both because, to the extent the employer could not prove its justificatory reason under the EPA, the same evidence (or lack of evidence) would likely show that the proffered legitimate, nondiscriminatory reason was false, and therefore pretextual, under Title VII.

### III.     DISCUSSION OF EVIDENCE AND FACTS

**A.     Generally Undisputed Facts**

According to witnesses for the Defendant, before the events leading to this litigation, the Baldwin County Tax Assessors' Office was insufficiently staffed—to the extent that the representatives from the county feared that if they did not act quickly then the state of Georgia would sanction Baldwin County. (McMullen Dep. 22:1-13). One position that needed to be filled was that of Chief Appraiser. In August 2005,

Baldwin County hired Calvin Hicks as Chief Appraiser. Prior to being hired by Baldwin County, Hicks had been an appraiser in Bibb County and had done some "contracting work for other counties." (Hicks Dep. 10:11-12).

Hicks's first task was to hire two field appraisers who could "hit the ground running." (McMullen Dep. 38:12-23). Essentially, a field appraiser's task is to gather sufficient data to develop an opinion of the value of property. Appraisers gather this data by noting the characteristics of any improvements to the property—such as type of construction, materials used, appendages, the condition and age of the structure, and the size and shape of the structure—as well as noting the conditions of the land itself. The base requirement for the advertised field appraiser positions was that the candidates be certified Appraiser II. Whereas someone with an Appraiser I certification would ordinarily hold a trainee position, an individual with an Appraiser II certification would have "[s]uccessfully complet[ed] the appraiser exam established for this level," "[b]e able to make field appraisals of the typical types of real and/or personal property," and "be able to research, analyze, and inspect property and gather all information necessary for appraisals such as size, zoning, use, location, construction quality, depreciation, and market data." (Pl.'s Ex. 6).

Hicks advertised the field appraiser openings through the Georgia Department of Labor. Jeremy Riley, Bob Simmons, the Plaintiff and others applied for the positions. Both Riley and Simmons had previously worked with Hicks in Bibb County, while the Plaintiff was working for Baldwin County in the area of code enforcement. Riley, Simmons and the Plaintiff were invited to interview with Hicks and Ralph McMullen, at the time the assistant county manager for Baldwin County, but ultimately only Riley and

Simmons were hired. They were offered a salary of $33,911.37. This salary was close to $8,000 more than what Riley and Simmons had been paid at Bibb County, and close to $4,000 more than either Riley or Simmons had asked for on their application. (Pl.'s Ex. 4 at 4; and Pl.'s Ex. 35 at 9).

The $33,911.37 salary offered to Riley and Simmons was also over $4,000 more than the normal starting salary for the field appraiser position, which is determined according to a county-wide pay scale system developed in cooperation with the Carl Vinson Institute of Government at the University of Georgia. According to this pay system, each job is assigned a pay grade—in the case of the field appraiser, the pay grade is 15. Within each grade are steps—a new hire is assigned a certain step and it is customary for the employee to receive a step raise each year (but an employee can never skip a step).[5] Typically a new hire would start at the first step—usually step A—in that pay grade. Riley and Simmons as new hires ordinarily would have started at 15-A, which, at the time, would have meant a salary of $29,641. Instead, Riley and Simmons started at a salary equivalent to a 15-G. The Defendant states that Riley and Simmons started at a higher step because of their past experience; because their salaries were "probably negotiated" (Hicks Dep. 70:8-11); and because the Defendant was "rather desperate" to fill the positions to avoid trouble with the state. (McMullen Dep. 22:7). The Plaintiff, though, argues that it was a violation of the pay plan for Riley and Simmons to start at any step above A.

---

[5] Occasionally an employee does not receive a yearly step raise. For instance, Riley received a pay freeze due to his being late for work multiple times. Also, Baldwin County has imposed a step-increase freeze for all county employees due to economic conditions.

Simmons worked for Baldwin County for about a month before he quit to take other employment. Rather than re-advertise the position, Hicks decided to offer the position to the Plaintiff. As noted, Riley and Simmons had started at 15-G, at a salary of over $33,000: the Plaintiff was offered a salary of $29,641, which was the salary equivalent to 15-A.[6] The Defendant justifies this lower salary for the Plaintiff by arguing that she was not as experienced as Riley and Simmons; that her Appraiser II certification was not current; that she did not negotiate for a higher wage; and because the department was no longer in dire straits.

The Plaintiff did not learn of the pay differential between her and Riley until she "overheard Jeremy Riley on the phone bragging . . . about how much" money he was making. (Waters Dep. 68:22-25). A few months after learning that she was making less than Riley, the Plaintiff attempted unsuccessfully to address the issue with various representatives of the Defendant.[7] The Plaintiff then wrote a "grievance" which she submitted to the Baldwin County Board of Tax Assessors. The Board referred the grievance to Phyllis Lavender, the Chief Appraiser hired after Hicks quit and to whom the Plaintiff had addressed her previous concerns, to investigate. Lavender concluded that the Plaintiff was at the proper grade and step. The Plaintiff then wrote a letter to the Baldwin County Board of Commissioners, who referred the matter to the County Attorney. The County Attorney investigated the Plaintiff's allegations, despite his

---

[6] The Plaintiff eventually passed her Appraiser III test and she received a grade bump to 16, but she is still making less than Riley. Assuming the step-increase freeze is lifted immediately, and that all other factors remain constant, the Plaintiff's salary will not catch up to Riley's for another 12 years. (McMullen Dep. 102:4-22).

[7] The Plaintiff states that she waited to address the pay differential with her employer because the county was in the process of hiring additional field appraisers, so she was waiting to learn what the new hires' starting salaries would be. (Waters Dep. 75:14-20).

conclusion that the time for the Plaintiff's grievance appeals had expired and that no further action was required.  The County Attorney concluded that the pay disparity was based on the Plaintiff's and Riley's respective levels of experience and qualifications.  After receiving the Board of Commissioners' response, the Plaintiff filed a charge of discrimination with the EEOC.  The EEOC issued a right to sue letter on April 16, 2009.

The Plaintiff filed suit in this Court on July 15, 2009.  After conducting a considerable amount of discovery, the Defendant filed this Motion.  The Defendant argues that it is entitled to judgment as a matter of law on the EPA claim because the pay disparity between the Plaintiff and Riley was based on her level of experience relative to his; because Riley negotiated his salary; and because the county was in a desperate situation and needed to hire a qualified individual immediately.  For these same reasons, the Defendant argues it is entitled to judgment as a matter of law on the Title VII claim because these reasons are all legitimate, non-discriminatory reasons.  The Plaintiff argues that the Defendant has failed to prove its defenses; and that, even if the Defendant did prove that the pay disparity was justified or that it was for a legitimate, non-discriminatory reason, those reasons are mere pretext.

**B.    Issues of Material Fact**

Even assuming, arguendo, that Baldwin County was in a desperate situation to hire field appraisers, which in and of itself would be an insufficient reason to justify such a pay disparity, there are simply too many issues of material fact to allow the Court to grant summary judgment.  These issues of material fact deal with the experience of Riley and the Plaintiff and the negotiation of Riley's salary.

*1.     Issues of Material Fact Regarding Experience*

Riley was hired by Bibb County in 2002. As far as the evidence concerning Riley's prior employment and experience is concerned, this is about the only factual assertion that can definitely be proven by the evidence. It is unclear what position Riley held at Bibb County, what his duties were, or even what kind of certification he had at the time he was hired by Baldwin County. There is some testimony that from 2003 until he left Bibb County Riley was performing field appraisals on his own for Bibb County, but it is unclear whether he performed residential or commercial appraisals. (*See* Pl.'s Ex. 2 at 6; and Hicks Dep. 20-26).

There is even conflicting evidence regarding what position Riley was qualified, by law, to hold. It is undisputed that Riley only had his Appraiser I certification for most, if not all, of the time he worked for Bibb County.[8] According to the Defendant's evidence, despite his certification, Riley was still able to act as an independent field appraiser. (See Hicks Dep. 18, 22-24). The Plaintiff disputes this. The Plaintiff presents evidence that because of his Appraiser I certification Riley legally would only be eligible to be an appraiser trainee and thus would be unable to perform field work on his own. (*See* Pl.'s Ex. 1 at 6; and Pl.'s Ex. 40).

Nevertheless, regardless of his experience, Riley represented to Hicks at his interview that he had been a commercial field appraiser for Bibb County. As was mentioned earlier, Hicks knew Riley from their time together at Bibb County, but there is also some evidence suggesting that, prior to either Riley or Hicks working for Baldwin

---

[8] Some evidence suggests that Riley may not have received his Appraiser II until 2006, which would mean that when he was hired at Baldwin County he was still an Appraiser I (thus ineligible to "hit the ground running" as Hicks wanted), whereas the Plaintiff had her Appraiser II certification, but that certification had lapsed.

County, Riley also may have assisted Hicks with a valuation of property in Monroe County. (*See* Hicks Dep. 100-05; c*f.* Pl.'s Ex. 36; and Pl.'s Ex. 4 at 4-8).

Because of the conflicting evidence, it is impossible to determine what exactly Riley's experience was. Did he perform field appraisal work independently for two years for Bibb County despite his Appraiser I certification? Was he a commercial or residential appraiser? Did he perform appraisals for Monroe County? These questions are just a few of the many crucial questions raised by the evidence in this case. Therefore, there are a clear issues of material fact as to Riley's experience.

There are also issues of fact regarding the Plaintiff's experience and how her experience compares to Riley's (and, consequently, whether, to the extent a difference in experience exists, the pay disparity is justified in light of such a difference in experience). The Plaintiff claims that, in contrast to Riley's limited experience, she had over a decade of appraisal experience. Riley received his Appraiser II certification in either 2005 or 2006; the Plaintiff was certified Appraiser II in 1995. At the time she received her Appraiser II certification, the Plaintiff was working in the Twiggs County Tax Assessors' Office—a position she held from 1986 to 1999. While the Defendant suggests that the Plaintiff's title was "clerk" and that her employment in Twiggs County could not be considered relevant experience with respect to the Baldwin County appraiser position, the Plaintiff disagrees. The Plaintiff admits that she was hired as a clerk and that her duties were mostly clerical at first, but she argues that she later began to perform tasks that a field appraiser would perform. In particular, the Plaintiff argues that after she received her Appraiser I certification in 1987 she began doing work relevant to a field appraiser's position and was being taught how field work was done.

Upon receiving her Appraiser II certification, the Plaintiff began going into the field on her own to appraise mobile homes and additions to real property, as well as other personal property. Before leaving Twiggs County in 1999, the Plaintiff's position was changed to Personal Property Appraiser. However, the Defendant contends that this experience appraising personal property (the appraisal of mobile homes and real property additions were considered personal property appraisals) was not at all relevant to what was required for real property appraising. (*See* Hicks Dep. 96:13-22).[9]

Conceding that the Plaintiff may have had some experience appraising real property, the Defendant argues that the Plaintiff never performed real property appraisal work on her own. The Plaintiff, however, argues that this is immaterial because "[w]orking in the field alone or in teams does not change the methodology and techniques in appraising property." (Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 9).

In 1999, the Plaintiff quit her job with Twiggs County and moved out of state, only to return a few months later. Shortly after her return to Georgia, the Plaintiff was hired by the Baldwin County Code Enforcement Department in 2000 and worked there until she took her current position with the Tax Assessors' Office. While in code enforcement, the Plaintiff worked as a permit clerk and as an administrative clerk. The Defendant, using the Plaintiff's own deposition testimony for support, argues that while working in code enforcement the Plaintiff did not use her appraisal skills or training.

---

[9] According to the Defendant, whereas the appraisal of real property involves a lot of field work and the computation of value based on one or more specialized methods, the appraisal of mobile homes and personal property does not. For instance, mobile homes "typically were appraised using manuals. You have an NADA that says it is the model. You look at the model. You look at the make. Here's the value of the mobile home." (Hicks Dep. 65:8-11). For this reason, mobile homes (and other personal property) are ". . . a different class of property . . ." from real property. (*Id.* at 65:7-8).

> Q. Tell me what your duties were there.
>
> A. I was a permit clerk issuing permits, issuing business license, schedule inspections, then I was promoted to administrative clerk, which I was responsible for the reports, revenue reports, time sheets, and supervision duties when needed.
>
> Q. Now, during that five-year period, it sounds like you weren't really using your appraisal skills and training; is that correct?
>
> A. That's right.

(Waters Dep. 34:1-10). Despite this testimony, the Plaintiff insists in her Response that she did continue to use her appraisal skills and training.

> Through my job in the Code Enforcement Office I gained valuable additional experience for my later as an Appraiser II. [sic] My Code Enforcement job required knowledge of code ordinances, including the inspection process, and criteria for issuing business license and building permits. Building permits, business licenses are tied to the tax assessor's office. Appraisers use building permits and business licenses in conducting field work. Appraisers also use inspection files to determine the percent completion of a structure. I was familiar with the county roads and subdivisions in the county. As a result, even though I was working in Code Enforcement, these job skills were related to appraisal work and were beneficial to me when I began my job as an Appraiser II.

(Pl.'s Ex. 39 ¶ 11).

Thus, the evidence is inconsistent as to what the Plaintiff's experience was at the time she was hired as a field appraiser in 2005. What is not disputed is that, when the Plaintiff was hired, her Appraiser II certification was not current—she had to take classes to become current. However, it is not clear what relevance this has to the Plaintiff's experience level. This is especially so if a jury determines that Riley was not yet an Appraiser II when he was hired—would either Riley or the Plaintiff be able to "hit the ground running" as Hicks wanted if Riley was just an Appraiser I and the Plaintiff was a non-current Appraiser II?

*2. Issues of Material Fact Regarding the Negotiation of Salaries*

There are also issues of material fact as to whether or not Riley's salary was negotiated. First, there is an issue of fact regarding whether Riley really did negotiate for a higher salary. Hicks testified only that Riley's salary was "probably negotiated." (Hicks Dep. 70:11). The only evidence about the actual negotiations, though, came from McMullen, who testified that it was Hicks who negotiated on behalf of Riley, despite the fact that Hicks did not know whether the negotiations took place. (*See* McMullen Dep. 38:12-39:7; and Hicks Dep. 75:5-13).[10] There is other evidence, though, that it would be highly unusual even to negotiate salaries for a position such as field appraiser. (*See* Minton Dep. 34:8-21; and McMullen Dep. 56:20-57:3). Typically salaries were only negotiated for positions such as department heads and assistant department heads—in fact, "very few others are negotiated." (McMullen Dep. 56:20-57:3). To the extent that Riley's salary was negotiated, it would have been an exception. (*Id.*)

Second, there is an issue of fact as to whether the pay scale even allowed Riley to skip steps upon hire. While he later contradicted himself, McMullen seemed to indicate that the pay plan allowed for an employee to skip steps because of experience, but that such a move would only be allowed after a probationary period. (*See* McMullen Dep. 19-20 and 115-17; *cf.* McMullen Dep. 117-18). However, there is also evidence, which may or may not be admissible, that the pay plan was properly applied. For example, the county attorney investigated and determined that the pay plan had been

---

[10] Interestingly, McMullen testified at deposition that when Hicks approached him to negotiate a higher starting salary, Hicks said that it would take the higher salary of $33,911.37 to convince Riley to relocate from Bibb County. (McMullen Dep. 40:13-18). However, on his application for the Baldwin County position, under "Salary Expected" Riley wrote "$14.05," a figure that would roughly equal the salary for a 15-A. (Pl.'s Ex. 4 at 4).

properly applied. (Pl.'s Ex. 9 at 2-3). Additionally, Joan Minton, the former county manager for Baldwin County, testified that she had contacted individuals at the Carl Vinson Institute and had received assurances that, with respect to Riley, Baldwin County had properly applied the pay plan (however, there is no record of this conversation—the only evidence of it is the hearsay testimony of Minton). (Minton Dep. 11:8-19:14).

In light of the conflicting evidence, it is impossible for the Court to determine if Riley's salary was negotiated, if the pay plan was violated, or if Riley's experience would justify Baldwin County making an exception to negotiate a salary for that was $4,000 higher than the normal starting salary (and, consequently, $4,000 higher than the Plaintiff's salary), and nearly $8,000 more than Riley's salary at Bibb County.

While these issues of material fact exist with respect to Riley's salary, there are no such issues with respect to the Plaintiff's salary. It is not disputed that the Plaintiff did not negotiate her salary. She was offered the starting salary appropriate to the pay plan at 15-A and she accepted it.

### III.    CONCLUSION

Accordingly, because there exist several issues of material fact, the Court cannot conclude whether the Defendant is entitled to judgment as a matter of law. Therefore, summary judgment is inappropriate. The Motion (Doc. 24) is **DENIED**.

**SO ORDERED**, this the 11th day of May, 2010.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

jch